# IN THE UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

| | |
|---|---|
| **APATEL, LLC,** a Florida Limited Liability Company d/b/a QUICK MART, and **ARATIBEN PATEL**, an Individual, <br><br>Plaintiffs, <br><br>v. <br><br>**UNITED STATES OF AMERICA**, <br><br>Defendant. | CASE NO. <br><br>**COMPLAINT** |

The Plaintiffs, APATEL, LLC, A FLORIDA LIMITED LIABILITY COMPANY D/B/A QUICK MART and ARATIBEN PATEL, an Individual, by and through their undersigned counsel and hereby file this Complaint against the UNITED STATES OF AMERICA upon the grounds set forth herein, and in support thereof, states as follows:

## FACTUAL BACKGROUND

1. The Plaintiff owns and operates a retail store in Orlando, Florida, named APATEL, LLC, A FLORIDA LIMITED LIABILITY COMPANY D/B/A QUICK MART (hereinafter referred to as "Quick Mart"). The store is comprised of a commercial storefront dedicated to retail sales of retail food market, focusing mostly on groceries to the Plaintiffs' customers.

2. Located in Orlando, Florida, Quick Mart serves a community with a high percentage of Supplemental Nutritional Assistance Program (SNAP, formerly the "Food Stamp Program") households.

3. Accordingly, Quick Mart began accepting Electronic Benefit Transfers (or "EBT") to better serve the local community and increase its attractiveness to SNAP customers. These SNAP customers eventually became a substantial share of the store's total clientele, responsible for a substantial portion of the store's gross revenue on EBT alone. In addition to EBT, the SNAP clientele account for an even larger portion of the gross revenue as they conduct significant non-SNAP transactions as well for ineligible items.

4. On November 6, 2023 the USDA, through the FNS, sent the Plaintiffs a Charge Letter pursuant to 7 C.F.R. §278.6, alleging that the store engaged in Trafficking of SNAP benefits (defined by 7 C.F.R. §271.2).

5. In support thereof, the Defendant claimed that a number of transactions conducted at the store appeared to be violative based upon statistical data analysis.

6. The transactions listed by the Defendant in the Charge Letter occurred between March 2023 and August 2023– a period of time which is referred to as the "Review Period."

7. The Plaintiffs responded to the Charge Letter and maintained that no trafficking had occurred.

8. Nevertheless, on December 11, 2023, the Plaintiffs were permanently disqualified by the Defendant from SNAP.

9. As a result, the store lost a considerable portion of its gross revenue (including revenue derived from SNAP participants' cash, credit & debit purchases) and a substantial portion of its clientele as a result of the Agency's disqualification.

10. The Plaintiffs, maintaining their innocence, filed an Administrative Review as permitted by 7 C.F.R. §279, and presented arguments and evidence in support of their request that the disqualification be overturned. The Plaintiffs took issue not only with the disqualification process and the inaccuracy of the evidence against them, but also with the comparative lack of direct evidence that any violations of SNAP retailer policies had occurred.

11. The Administrative Review Branch of the FNS responded to the Plaintiffs' appeal in a letter and opinion entitled Final Agency Decision, dated March 1, 2023, which was received on March 6, 2023, and attached hereto as **Exhibit "A"**. The Plaintiffs' administrative appeal was denied.

12. This Judicial Appeal has been filed timely, to seek the reversal of the USDA's current decision to permanently disqualify the Plaintiffs from participating as a SNAP retailer.

## JURISDICTION AND VENUE

13. The Plaintiffs bring this action based upon their disqualification from

eligibility to participate in the Supplemental Nutrition Assistance Program, as codified by Congress in 7 U.S.C. §§ 2011 – 2036(c).

14. This Court has subject matter jurisdiction over the matters raised by the Plaintiffs in this case pursuant to 7 U.S.C. §2023(17), and 7 C.F.R. §279.7. Furthermore, 28 U.S.C. §1331 gives this Court original jurisdiction over civil actions arising under the laws of the United States, for which the aforementioned statute and regulation qualify.

15. Venue is appropriate in this District pursuant to 7 C.F.R.§279.7(a), 7 U.S.C. §2023(13) and 28 U.S.C. §1391(b) as Plaintiffs' business was owned and operated in Orlando, Florida, and because the facts giving rise the circumstances herein occurred in the Middle District of Florida-Orlando Division.

## PARTIES

16. The Plaintiff, APATEL, LLC, A FLORIDA LIMITED LIABILITY COMPANY D/B/A QUICK MART operates at 520 South Orange Blossom Trail, Orlando, Florida 32805-2520. APATEL, LLC, A FLORIDA LIMITED LIABILITY COMPANY D/B/A QUICK MART is referred to herein as "Quick Mart" and referred to herein collectively with the other Plaintiffs as "Plaintiffs".

17. The Plaintiff, ARATIBEN PATEL, an Individual, is a natural person, and the registered owner of Quick Mart, and is referred to herein collectively with the other Plaintiffs as "Plaintiffs".

18. The Defendant, the UNITED STATES OF AMERICA, acting through its agency, the United States Department of Agriculture (hereinafter referred to as the "USDA" or "Department"), and its subservice, the Food and Nutrition Service. The Defendant may be referred to herein as "the Government" or "the Department".

## GENERAL ALLEGATIONS

19. SNAP is a government program operated pursuant to Title 7 United States Code, Chapter 51, and codified more specifically as 7 U.S.C. §§2011-2036(c).

20. The general purpose of SNAP is to provide food benefits (formerly "food stamps") to program participants who meet certain financial need requirements. SNAP participants are awarded benefits (money) issued on a state-by-state basis in varying amounts based upon the needs of their household. These benefits are transmitted to, and utilized by the participant, through an Electronic Benefits Transfer (EBT) card, which conceptually functions similar to a debit card.

21. The benefits are to be used by the participant only for the purchase of food and other eligible items sold by approved SNAP retailer, such as Quick Mart.

22. In turn, SNAP retailers are governed by the Defendant through 7 C.F.R. §278.6 which in pertinent part permits the disqualification or suspension of retailers who violate SNAP regulations.

23. Significantly, SNAP violations on the part of retailers typically occur in two areas: (1) the sale of ineligible items to SNAP participants (using their EBT

benefits), and (2) trafficking in SNAP benefits.

24. The term "trafficking" is defined at length by 7 C.F.R. §271.2, which states in pertinent part that trafficking is:

> "(1) The buying, selling, stealing, or otherwise effecting an exchange of SNAP benefits issued and accessed via Electronic Benefit Transfer (EBT) cards, card numbers and personal identification numbers (PINs), or by manual voucher and signature, for cash or consideration other than eligible food, either directly, indirectly, in complicity or collusion with others, or acting alone;
>
> (2) The exchange of firearms, ammunition, explosives, or controlled substances, as defined in section 802 of title 21, United States Code, for SNAP benefits;
>
> (3) Purchasing a product with SNAP benefits that has a container requiring a return deposit with the intent of obtaining cash by discarding the product and returning the container for the deposit amount, intentionally discarding the product, and intentionally returning the container for the deposit amount;
>
> (4) Purchasing a product with SNAP benefits with the intent of obtaining cash or consideration other than eligible food by reselling the product, and subsequently intentionally reselling the product purchased with SNAP benefits in exchange for cash or consideration other than eligible food; or
>
> (5) Intentionally purchasing products originally purchased with SNAP benefits in exchange for cash or consideration other than eligible food;
>
> (6) Attempting to buy, sell, steal, or otherwise affect an exchange of SNAP benefits issued and accessed via Electronic Benefit Transfer (EBT) cards, card numbers and personal identification numbers (PINs), or by manual

voucher and signatures, for cash or consideration other than eligible food, either directly, indirectly, in complicity or collusion with others, or acting alone."

See 7 C.F.R. §271.2 (2016)

25. While most of 7 C.F.R. §278.6 sets forth a graduated scale for punishment of SNAP retailers for the sale of ineligible items, trafficking is treated more harshly. Specifically, if a retailer is found to be trafficking in SNAP benefits, it (more specifically, the individual(s) who applied for SNAP participation) is permanently disqualified from participation in the program and may be issued a Transfer of Ownership Civil Money Penalty (CMP) of $11,000.00 per violation. FNS also adds the retailer and its owner(s) and officer(s) to the federal database list of disqualified persons without notice or opportunity to appeal or be heard.

26. In this matter the government maintains that there were four (4) violations.

27. The Transfer CMP itself is not immediately assessed against the retailer, but instead assessed at the time the retail store is sold (regardless of the period of time intervening between the permanent disqualification and the sale).

28. Such are the circumstances of this case. The Plaintiffs have been permanently disqualified by the Defendant, resulting in damage to the Plaintiffs and a potential future fine.

### ERRORS & OMISSIONS ON THE PART OF THE DEFENDANT

29. In the instant case, the Plaintiffs did not engage in trafficking in SNAP benefits and have defended against the allegations accordingly.

30. The Defendant lacks any direct evidence (eye-witness accounts, receipts, or the like) that trafficking occurred.

31. Instead, the Defendant based its disqualification upon data analysis, which is circumstantial by definition: evidence from which more than one logical conclusion can be reached.[1]

32. This type of evidence leaves considerable room for misinterpretation of the data and erroneous conclusions surrounding the nature of transactions.

33. In the instant case, the USDA's analysis of the data *intentionally* precluded alternative explanations for the presence of the transactions, and instead opted for a biased and statistically unsound analysis designed solely to result in a disqualification of the store.

34. Furthermore, the USDA violated its own operating procedures in evaluating the Plaintiffs' case.

35. Each of the transactions set forth in the Charge Letter were categorized and selected by the Defendant's ALERT System computer program, which identifies

---

[1] This reference is drawn from *Chief Counsel Advisory*, IRS CCA 200912021, though it is perhaps the best succinct definition of the term.

specific transaction types, including four of which are addressed herein:

    a.    "Same Cent transactions" (commonly referred to as Scan A1);

    b.    "Multiple transactions were made from the accounts of individual households within a set time period" (commonly referred to as Scan B2);

    c.    "Households remaining benefits were depleted within short time frames" (commonly referred to as Scan C); and

    d.    "Excessively Large purchase transactions were made from recipient accounts" (commonly referred to as Scan F).

36. The Department does not have any statistical studies, data analysis, or supporting evidence to show that either of those categories to the SNAP violation of "trafficking." In fact, the Defendants' Rule 30(b)(6) witness on the ALERT system's purpose and capabilities, Mr. Douglas Wilson, has previously testified on multiple occasions that those transaction categories are merely suspicious, and not in-and-of-themselves, indicative of trafficking.[2]

37. The Department has never conducted a study to determine the correlation coefficient of the statistical connection between trafficking and the

---

[2] Mr. Wilson's Deposition transcripts are the result of other Judicial SNAP reviews pertaining to trafficking and data analysis. The Plaintiffs will separately produce them to the Defendant, and present as necessary to this Court. However, attachment to this Complaint would be unnecessary and redundant.

alleged violative transaction categories.

38. Mr. Wilson, as the Government's Rule 30(b)(6) witness with the most knowledge of the ALERT system, acknowledged other such statistical-analysis shortcomings by indicating that the categories and transactions cannot distinguish between different SNAP violation types (such as trafficking, issuance of credit, and sale of ineligible items).

39. Ultimately, there is no statistically meaningful correlation between the four transaction categories utilized by the Defendant and the act of "trafficking."

40. Despite this, cases using the ALERT system's categories are referred to FNS' Investigative Analysis Branch (IAB) for investigation and prosecution.

41. This instant matter was just such a case, referred to IAB Section Chief Mr. Anthony Pesini's division for evaluation and prosecution. Mr. Pasini was the Section Chief that issued the permanent disqualification in this case.

42. This process is not an impartial one, nor is it unbiased. As a rule, every single case referred to the IAB for data analysis is charged with trafficking in SNAP benefits.

43. Of the thousands of cases handled every year, the IAB makes a finding of trafficking in nearly all (between 95% and 100% depending upon the section) of the cases. There is no impartiality in this process. It is an assembly line.

44. The Defendant, in this case did little in way of investigation to support

its position that trafficking was more likely than not the cause of trafficking. Keeping in mind that the Plaintiffs never saw the unredacted Administrative Record prior to filing this suit (this is not an exhaustive list of the failures on the party of the Defendant's data analysis):

    a.    The Defendant did not interview the households engaged in the transactions, despite having the ability to do so, and instead engaged in wrote speculation as to the preferences and explanation for their shopping habits;

    b.    The Defendant continued to rely upon data comparison with other stores that differ materially in business, inventory, clientele and circumstances; and

    c.    The Defendant did not conduct any research on household shopping preferences and spending habits, specifically with the effect on participants' store selection habits, item selection, purchase transaction frequency and transaction sizes.

45.    At the initial stages of the Administrative Decision, it is the Government's burden to prove by a preponderance of the evidence that it is more likely than not that trafficking had occurred.[3]

46.    The Government did not (and does not) have sufficient evidence to

---

[3] On Judicial Appeal, the burden rests with the Plaintiffs.

meet that burden, or to link the transactions to trafficking.

47. For purposes of a judicial review, the burden does switch to the Plaintiff and for purposes of this matter, the Plaintiff bears the burden of proof.

## PLAINTIFFS' ALLEGATIONS

48. The Plaintiffs do not have access to the Administrative Record. At no point in this process have the Plaintiffs been given access to the pertinent records (aside from the Charge Letter, Initial Disqualification Letter, and Final Agency Decision) relied upon by the Department in its analysis.

49. Furthermore, there have been no decisions made by Administrative Law Judges, Department Attorneys or other legal-trained individuals who could adequately weigh the evidence before the Department during the administrative process to date.

50. What little Due Process actually exists in these cases is borne out only here at the Judicial Review stage of the case.

51. The Plaintiff's transactions were bonafide purchases of food items, in exchange for SNAP benefits as the system was intended.

52. The shopping habits of SNAP participants in the store are consistent with the transactions listed, and the Plaintiffs anticipate such testimony from these households.

53. The Plaintiffs' explanations for the transaction categories, as set forth

in their response to the USDA-FNS in their Response to Charge Letter and Administrative Brief, are consistent with the actual shopping habits and trends that occur in the store.

54. In any case, the Store was not engaged in trafficking SNAP benefits either during the Review Period or at any other time.

### COUNT I: REQUEST FOR JUDICIAL REVIEW

55. The Plaintiffs incorporate and restate each and every paragraph set forth above as though more fully set forth herein.

56. The Plaintiffs, pursuant to 7 U.S.C. §2023 and 7 C.F.R. §279.7 have the right to, and hereby do request a *de novo* judicial review of the permanent disqualification issued by the Defendant.

57. The Plaintiffs maintain that they did not traffick in SNAP benefits and ask that the Court conduct a trial on the merits of the matter, permitting the parties to present testimony and submit evidence in support of their positions.

58. The transaction categories cited by the Defendant are the result of the Plaintiffs' regular business practices, inventory, location and the SNAP participants' shopping preferences.

59. The Defendant failed to adequately account for the shopping habits of the store's SNAP clientele.

60. The Defendant failed to adequately identify appropriate SNAP retailers

for statistical and transactional comparison purposes.

61. Such failures referenced above materially impacted the Government's analysis and led to the errant conclusion that trafficking was occurring.

62. Furthermore, the Plaintiffs qualified for the issuance of a Civil Money Penalty, but their request was errantly denied by the Defendant.

63. The Defendant's decisions to both disqualify the store and deny the issuance of a civil money penalty were both invalid and inaccurate for those reasons set forth above, as well as such further reasons as may be uncovered during the discovery phase of this matter.

64. Accordingly, the permanent disqualification of the Plaintiffs should be reversed, and the Plaintiffs should be removed from the disqualified persons/store lists maintained within the Department.

65. Furthermore, to the extent that the Plaintiffs incur attorneys' fees and court costs in conjunction with this Judicial Appeal, the Defendant should be made to pay such fees and costs.

WHEREFORE, the Plaintiffs, APATEL, LLC, A FLORIDA LIMITED LIABILITY COMPANY D/B/A QUICK MART and ARATIBEN PATEL, an Individual, respectfully ask this Court to conduct a *de novo* review of this matter, conduct a trial upon the merits of the Plaintiffs' case, and enter Judgment reversing the permanent disqualification, as well as awarding the Plaintiffs any attorney's fees

and court costs they may incur in this matter.

Dated: April 4, 2024                                     Respectfully submitted,

                                                   **METROPOLITAN LAW GROUP, PLLC**

                                                 */s/ Andrew Z. Tapp*
                                                 ANDREW Z. TAPP, ESQ.
                                                 Florida Bar No.: 68002
                                                 1971 W. Lumsden Road, #326
                                                 Brandon, Florida 33511-8820
                                                 Telephone:  (813) 228-0658
                                                 Facsimile:  (813) 330-3129
                                                 Email:  Andrew@Metropolitan.Law
                                                                    LaJeana@Metropolitan.Law

                                               **COUNSEL FOR PLAINTIFFS**